**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| FOREST LABORATORIES, INC., *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) C.A. No. 08-52 (GMS) |
| v. | ) |
| | ) |
| DR. REDDY'S LABORATORIES, INC., DR. | ) |
| REDDY'S LABORATORIES LIMITED, | ) |
| GENPHARM IC., GENPHARM, L.P., | ) |
| INTERPHARM HOLDINGS, INC., | ) |
| INTERPHARM, INC., MYLAN | ) |
| PHARMACETICALS INC., RANBAXY, INC., | ) |
| RANBAXY LABORATORIES LIMITED, | ) |
| KENDLE INTERNATIONAL INC., SUN INDIA | ) |
| PHARMACEUTICAL INDUSTRIES LIMITED | ) |
| (a/k/a SUN PHARMACEUTICAL INDUSTRIES | ) |
| LTD.), SYNTHON HOLDING B.V., SYNTHON | ) |
| B.V., SYNTHON LABORATORIES, INC., and | ) |
| SYNTHON PHARMACEUTICALS, INC. | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM IN SUPPORT OF SYNTHON HOLDING B.V., SYNTHON B.V.,
SYNTHON LABORATORIES, INC. AND SYNTHON PHARMACEUTICALS, INC.'S
MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(2), 12(b)(3) AND 12(b)(5),
OR, IN THE ALTERNATIVE, TO TRANSFER**

*Of Counsel:*
E. Anthony Figg
Joseph A. Hynds
Lisa N. Phillips
ROTHWELL, FIGG, ERNST & MANBECK, P.C.
1425 K Street, N.W., Suite 800
Washington, D.C. 20005
Tel: 202-783-6040
Fax: 202-783-6031
efigg@rothwellfigg.com
jhynds@rothwwellfigg.com
lphillips@rothwellfigg.com

Elizabeth M. McGeever (# 2057)
Melissa N. Donimirski (# 4701)
PRICKETT, JONES & ELLIOT, P.A.
1310 King Street
Wilmington, DE 19899
Tel: 302-888-6500
Fax: 302-658-0111
emmcgeever@prickett.com

*Attorney for Defendants, Synthon Holding
B.V., Synthon B.V., Synthon Laboratories,
Inc. and Synthon Pharmaceuticals, Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................................... iii

NATURE AND STAGE OF THE PROCEEDINGS ....................................................................1

SUMMARY OF THE ARGUMENT ...........................................................................................3

I.      FACTUAL BACKGROUND................................................................................................4

A.     The Parties ..........................................................................................................................4

        1.      Forest Laboratories, Inc. ........................................................................................4

        2.      Forest Laboratories Holdings, Ltd. ........................................................................5

        3.      Merz Pharma GmbH & Co KGaA.........................................................................5

        4.      Merz Pharmaceuticals GmbH ................................................................................5

        5.      Synthon Holding B.V...............................................................................................5

        6.      Synthon B.V.............................................................................................................6

        7.      Synthon Laboratories, Inc.......................................................................................6

        8.      Synthon Pharmaceuticals, Inc.................................................................................7

B.     Development of Synthon Labs' Memantine Hydrochloride Product and
       Subsequent Filing of the Corresponding Abbreviated New Drug Application .................7

C.     The Present Action.............................................................................................................8

II.     ARGUMENT....................................................................................................................8

A.     THIS ACTION SHOULD BE DISMISSED BASED ON LACK
       OF PERSONAL JURISDICTION OVER THE SYNTHON ENTITIES ...........................8

1.     There Is No Personal Jurisdiction Over the Synthon Entities in this Court........................9

        a.     There is no General Personal Jurisdiction Over the Synthon Entities
            in the District of Delaware .......................................................................................9

i

**TABLE OF CONTENTS (cont'd)**

Page

b.    There is No Specific Jurisdiction Over the Synthon Entities
in this District.................................................................................................12

(i)    The Delaware Long-Arm Statute Does Not Apply to the
Synthon Entities.........................................................................12

(a)    10 Del C. § 3104(c)(1) and (c)(3) Do Not Apply
To Confer Jurisdiction Over the Synthon Entities.........................13

(b)    10 Del. C. § 3104(c)(4) Does Not Apply to Confer
Jurisidction Over the Synthon Entities ..........................14

2.    The Assertion of Personal Jurisdiction Over the Synthon Entities Would
Not be Reasonable and Would Violate Due Process ..........................................17

a.    The Burden on The Synthon Entities...................................................17

b.    The District of Delaware's Interests in Adjudicating the Dispute .........17

c.    The Plaintiffs' Interests in Obtaining Convenient and and Effective
Relief.................................................................................................17

d.    The Interstate Judicial System's Interest in Obtaining the Most
Efficient Resolution of the Controversy ...............................................17

e.    The Shared Interest of the States in Furthering Substantive Social
Policies..............................................................................................18

B.    THIS ACTION SHOULD BE DISMISSED BASED ON IMPROPER VENUE.............18

C.    THIS ACTION SHOULD BE DISMISSED BASED ON INSUFFICIENT
SERVICE OF PROCESS PURSUANT TO FED. R. CIV. P. 12(b)(5) ...........................19

D.    IN THE ALTERNATIVE, THIS CASE SHOULD BE TRANSFERRED TO
THE EDVA PURSUANT TO 28 U.S.C. § 1406(a).........................................20

CONCLUSION.......................................................................................................21

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page**

*Akro Corp. v. Luker*, 45 F.3d 1541 (Fed. Cir. 1995),
    *cert. denied*, 515 U.S. 1122 (1995) .................................................................................... 9

*Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.*, 444 F.3d 1356 (Fed. Cir. 2006),
    *reh'g denied*, 2006 U.S. App. LEXIS 14551 (Fed. Cir. 2006) ......................................... 19

*Energy Trans. Group, Inc. v. William Demant Holding, A/S*,
    No. 05-422, 2008 U.S. Dist. LEXIS 845 (D. Del. Jan. 4, 2008) .......................... 13, 14, 16

*FS Photo, Inc. v. Picturevision*, 48 F. Supp. 2d 442 (D. Del. 1999) ............................................ 20

*Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*,
    516 F. Supp. 2d 324 (D. Del. 2007) ................................................................................. 18

*ICT Pharms., Inc. v. Boehringer Ingelheim Pharms., Inc.*,
    147 F. Supp. 2d 268 (D. Del. 2001) ................................................................................. 12

*Inamed Corp. v. Kuzmak*, 249 F.3d 1356 (Fed. Cir. 2001) .......................................................... 12

*Intel Corp. v. Silicon Storage Tech., Inc.*, 20 F. Supp. 2d 690 (D. Del. 1998) ............................ 15

*Japan Gas Lighter Assoc. v. Ronson Corp.*, 257 F. Supp. 219 (D. N.J. 1966) ............................. 19

*La Chemise Lacoste v. General Mills, Inc.*, 53 F.R.D. 596 (D. Del. 1971) ................................... 20

*M&M Techs., Inc. v. Gurtler Chems., Inc.*, No. 03-994,
    2005 U.S. Dist. LEXIS 1726 (D. Del. February 8, 2005) ........................................ 9, 13, 14

*Merck & Co. v. Barr Labs., Inc.*, 179 F. Supp. 2d 368  (D. Del. 2002) .............................. 9, 12, 15

*Monsanto Co. v. Syngenta Seeds, Inc.*, No. 04-305, 2006 U.S. Dist. LEXIS 54534
    (D. Del. August 4, 2006) ........................................................................................ 9, 15, 17

*Mylan Pharms., Inc. v. Kremers Urban Dev. Co.*, No. 02-1628,
    2003 U.S. Dist. LEXIS 5728 (D. Del. Apr. 7, 2003) ........................................................ 18

*Physician Endorsed LLC v. Clark*, 374 F. Supp. 2d 395 (D. Del. 2005) ............................. 9, 14, 16

*Reach & Assocs., P.C. v. Dencer*, 269 F. Supp. 2d 497 (D. Del. 2003) .................................. 13, 15

*Viam Corp. v. Iowa Exp.-Imp. Trading Co.*, 84 F.3d 424 (Fed. Cir. 1996) ................................. 16

## TABLE OF AUTHORITIES (cont'd)

**Rules and Statutes**                                                                    **Page**

21 U.S.C. § 355(j)(5)(B)(iii) ........................................................................................2

28 U.S.C. § 1391(c) ....................................................................................................19

28 U.S.C. § 1391(d) ...................................................................................................19

28 U.S.C. § 1400(b) ...................................................................................................19

28 U.S.C. § 1406(a) ..............................................................................................1, 19, 20

10 Del. C. § 3104(c)....................................................................................................13

Fed. R. Civ. P. 12(b)(2).......................................................................................... *passim*

Fed. R. Civ. P. 12(b)(3).......................................................................................... *passim*

Fed. R. Civ. P. 12(b)(5).......................................................................................... *passim*

Defendants, Synthon Holding B.V. ("Synthon Holding"), Synthon B.V. ("Synthon"), Synthon Laboratories, Inc. ("Synthon Labs"), and Synthon Pharmaceuticals, Inc. ("Synthon Pharms") (collectively, the "Synthon Entities"), respectfully submit this memorandum in support of their motion to dismiss this action based on lack of personal jurisdiction over the Synthon Entities pursuant to Fed. R. Civ. P. 12(b)(2), improper venue pursuant to Fed. R. Civ. P. 12(b)(3), and, insufficient service of process pursuant to Fed. R. Civ. P. 12(b)(5). In the alternative, the Synthon Entities request that this action be transferred to the Eastern District of Virginia ("EDVA") pursuant to 28 U.S.C. § 1406(a).

## NATURE AND STAGE OF THE PROCEEDINGS

On January 25, 2008, Forest Laboratories, Inc. ("Forest Labs"), Forest Laboratories Holdings, Ltd. ("Forest Holdings), Merz Pharma GmbH & Co KGaA ("Merz") and Merz Pharmaceuticals GmbH ("Merz Pharms"), (collectively, "Plaintiffs"), filed an initial complaint against various defendants alleging infringement of the '703 patent based on defendants' filings of Abbreviated New Drug Applications ("ANDAs") seeking approval for the manufacture, use and sale of generic memantine hydrochloride tablets. On February 15, 2008, Plaintiffs filed an Amended Complaint adding each of the Synthon Entities as a defendant, after receiving notice that Synthon Labs had also filed an ANDA containing a Paragraph IV Certification with respect to the '703 patent. This is the Synthon Entities' first response to the Amended Complaint.

Dismissal or transfer is required because venue is not proper here, and none of the Synthon Entities nor the cause of action have a significant relationship with this District. Plaintiff, Forest Labs, is a Delaware corporation but is not located within the State and Plaintiff, Forest Holdings, is an Irish corporation located in Bermuda. Plaintiffs, Merz and Merz Pharms, are both German corporations located in that country. Two of the four named Synthon Entities,

1

Synthon Holdings and Synthon BV, are Dutch companies located in the Netherlands. The other two Synthon Entities, Synthon Pharms and Synthon Labs, are located and incorporated in North Carolina and Virginia, respectively. In short, none of the Synthon Entities "reside" in this District.

Further, no part of Plaintiffs' alleged cause of action arises out of conduct in this District. This patent infringement action arises from what the Supreme Court has called a "highly artificial" act of infringement. Specifically, Plaintiffs allege that Synthon Labs' filing of an Abbreviated New Drug Application ("ANDA") with the Food and Drug Administration ("FDA") constitutes infringement of Merz's United States Patent No. 5,061,703 (the "'703 Patent") under 35 U.S.C. § 271(e)(2)(A). The '703 Patent claims methods of treating cerebral ischemia utilizing adamantane derivatives. Forest Labs is the holder of the approved New Drug Application for Namenda®, and Plaintiffs listed the '703 Patent in the FDA's so-called "Orange Book" in connection with that product. Through its ANDA, Synthon Labs seeks FDA approval of a generic memantine hydrochloride product prior to expiration of the '703 Patent. Pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV), Synthon Labs certified that it believes the '703 Patent to be invalid or not infringed, and Synthon Labs provided notice of this Paragraph IV certification to Plaintiffs. Plaintiffs brought this action within forty-five days of such notice, thereby triggering an automatic stay of FDA approval of Synthon Labs' ANDA. *See* 21 U.S.C. § 355(j)(5)(B)(iii).

The ANDA at issue was filed by Synthon Labs from its offices in Virginia. The filing of the ANDA was the only conduct alleged by Plaintiffs to constitute an act of direct infringement, and that conduct occurred outside of this District. The new product was developed outside the United States under the direction of the Dutch defendant, Synthon BV. Synthon Holding had nothing to do with the development of the product or the filing of the ANDA. Synthon Pharms'

2

involvement here included, *inter alia*, initial contacts with the FDA regarding the type of studies necessary to establish bioequivalence prior to the start of development and an advisory role with respect to review and comment on the ANDA, which activities all were performed outside of this District, specifically in North Carolina.

The Synthon Entities are not subject to jurisdiction based on the Delaware long-arm statute since none of them maintain a persistent course of conduct within the State. Additionally, none of the acts on which the Plaintiffs' allegations of infringement rest were performed in the State of Delaware. As a result, Plaintiffs' service of process on the Secretary of State of Delaware pursuant to that statute was insufficient.

Because personal jurisdiction is not proper here over any of the Synthon Entities, because venue is not proper in this District, and, because the Synthon Entities were not properly served, Defendants request that this action be dismissed, or, alternatively, transferred to the Eastern District of Virginia pursuant to 28 U.S.C. § 1406.

### SUMMARY OF THE ARGUMENT

(1)    This Court does not have personal jurisdiction over the Synthon Entities under either a general jurisdiction or a specific jurisdiction theory. None of the Synthon Entities have "continuous and systematic" contact with this forum, nor did any of the acts that relate to the action occur in the State of Delaware. The Delaware long-arm statute does not confer jurisdiction over the Synthon Entities, because none of the acts leading to the filing of this action occurred in Delaware and the Synthon Entities have undertaken no "persistent course of conduct" in the State. Finally, even if jurisdiction existed, the exercise of that jurisdiction over the Synthon Entities would not be reasonable and would violate due process. *See* Section II.A.

(2)    This Court is not the proper venue for this action. None of the Synthon Entities resides here, nor do any of them have offices or other facilities in this District. Nor did the alleged infringing acts occur in the State. Because there is no general or specific personal jurisdiction over the Synthon Entities here, venue does not properly lie here. *See* Section II.B.

(3)    The Synthon Entities were not properly served pursuant to the Delaware long-arm statute, because the requirements of that statute as it relates to service of a nonresident do not apply to any of the Synthon Entities. Specifically, none of the acts leading to the filing of this action occurred in Delaware and the Synthon Entities have undertaken no "persistent course of conduct" in the State. As the statute does not confer jurisdiction over the Synthon Entities, service under that statute is not proper. *See* Section II.C.

(4)    If the Court believes that it would be in the interests of justice to transfer the case *in lieu* of dismissal, the Synthon Entities request that the case be transferred to the Eastern District of Virginia. That Court is both a district in which the case could have been brought and a venue in which none of the Synthon Entities would contest personal jurisdiction.

## I.
## FACTUAL BACKGROUND

**A.    The Parties**[1]

**1.    Forest Laboratories, Inc.**

Forest Labs is a Delaware corporation having a principal place of business at 909 Third Avenue, New York, New York 10022. Amended Complaint, ¶ 1 (D.I. 31). Forest Labs, along with Forest Holdings, is alleged to be the exclusive licensee and the exclusive distributor of

---

[1]    Although the Synthon Entities each request transfer herein, each of them reserves its right to pursue dismissal pursuant to, *inter alia*, Fed. R. Civ. P. 12(b)(6), Fed. R. Civ. P. 19, 21 or 56 once the present motion has been decided.

Namenda® in the United States. Amended Complaint, ¶¶ 2, 40-41.[2]  Forest Labs is the holder of NDA No. 21-487 for Namenda® brand memantine hydrochloride tablets. Amended Complaint, ¶ 40.

### 2.    Forest Laboratories Holdings, Ltd.

Forest Holdings is an Irish corporation with its principal place of business at Milner House, 18 Parliament Street, Hamilton JM11, Bermuda.  Amended Complaint, ¶ 2.  Forest Holdings, along with Forest Labs, is alleged to be the exclusive licensee and the exclusive distributor of Namenda® in the United States. Amended Complaint, ¶¶ 2, 40-41.

### 3.    Merz Pharma GmbH & Co KGaA

Merz is a German corporation having its principal place of business at Eckenheimer Landstraße 100, D-60318 Frankfurt am Main, Germany.  Amended Complaint, ¶ 3.  Merz is the assignee listed on the face of the '703 Patent. Amended Complaint, Exhibit A.

### 4.    Merz Pharmaceuticals GmbH

Merz Pharms is a German corporation having its principal place of business at Eckenheimer Landstraße 100, D-60318 Frankfurt am Main, Germany.  Amended Complaint, ¶ 4.  Merz Pharms, along with Merz, is alleged to be the assignee of the '703 Patent.  Amended Complaint, ¶¶ 4, 39.

### 5.    Synthon Holding B.V.

Synthon Holding is a Dutch company, with its principal place of business in the Netherlands.  Amended Complaint, ¶ 16; Declaration of Anthonie O.F. Croiset van Uchelen in Support of Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2), 12(b)(3) and

---

[2]  The product insert represents that the distributor of the Namenda® product is Forest Pharmaceuticals, Inc., a subsidiary of Forest Labs, located in St. Louis, MO. Namenda® product insert, attached hereto as Exhibit D.

12(b)(5), or, in the Alternative, to Transfer ("van Uchelen Decl."), ¶¶ 4-5, attached hereto as Exhibit A. Synthon Holding is the ultimate parent, although not directly, of each of Synthon BV, Synthon Pharms and Synthon Labs. *Id.*, at ¶ 2. Synthon Holding had no hands-on involvement in the development of Synthon Labs' generic memantine hydrochloride product or the preparation and filing of the ANDA, which is the subject of the present litigation. *Id.*, at ¶ 7.

### 6.    Synthon B.V.

Synthon BV is also a Dutch company, with its principal place of business in the Netherlands. Amended Complaint, ¶ 17; van Uchelen Decl., ¶ 8. Synthon BV is an indirect subsidiary of Synthon Holding, as well as, a sister corporation to both Synthon Pharms and Synthon Labs. *Id.*, ¶ 2. There is no direct relationship between Synthon BV, Synthon Pharms and Synthon Labs. *Id.*, ¶ 3. Synthon BV was involved in both the development of the generic memantine hydrochloride product and the preparation and assembly of the ANDA which is the subject of the present litigation. *Id.*, ¶¶ 11-12.

### 7.    Synthon Laboratories, Inc.

Synthon Labs is a Virginia corporation, with its principal place of business in Gainesville, Virginia. Amended Complaint, ¶ 18; Declaration of Joseph Marchetti in Support of Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2), 12(b)(3) and 12(b)(5), or, in the Alternative, to Transfer ("Marchetti Decl."), ¶ 2, attached hereto as Exhibit B. Synthon Labs is an indirect subsidiary of Synthon Holding. *Id.*, ¶ 3. Synthon Labs submitted ANDA No. 90-047 seeking approval from the FDA for the manufacture, use and sale of generic memantine hydrochloride tablets, which ANDA is the subject of this litigation, and once that ANDA is approved, will be the sole ANDA holder. *Id.*, ¶ 11. Synthon Labs does not sell product in this District, nor in the United States as a whole. *Id.*, ¶ 4.

6

### 8.    Synthon Pharmaceuticals, Inc.

Synthon Pharms is a North Carolina corporation with its principal place of business in North Carolina.  Amended Complaint, ¶ 19; Declaration of Michael H. Hinckle in Support of Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2), 12(b)(3) and 12(b)(5), or, in the Alternative, to Transfer ("Hinckle Decl."), ¶ 2, attached hereto as Exhibit C.  Synthon Pharms participated in, *inter alia*, initial consultation with the FDA regarding the studies required to establish bioequivalence to Namenda® and provided, in an advisory role, review and comment to the ANDA.  *Id.*, at ¶¶ 7-8.  All of those activities occurred in North Carolina, outside of this District.  *Id.*, ¶ 9.

### B.    Development of Synthon Labs' Memantine Hydrochloride Product and Subsequent Filing of the Corresponding Abbreviated New Drug Application

Synthon BV developed the memantine hydrochloride product that is the basis of Synthon Labs' ANDA.  van Uchelen Decl., ¶ 11; Marchetti Decl., ¶ 5.  The development work on the product occurred in the Netherlands and in Europe.  van Uchelen Decl., ¶ 12; Marchetti Decl., ¶ 6.  The batches of the product which were manufactured in support of the ANDA were made by a manufacturer outside of the United States.  Marchetti Decl., ¶ 7.  The quality control and stability studies submitted in support of the ANDA were either conducted by Synthon BV, or on Synthon BV's behalf by a laboratory outside of the United States.  Marchetti Decl., ¶ 8.  The *in vitro* testing completed to support the ANDA was performed at the direction of Synthon BV, outside of the United States.  Marchetti Decl., ¶ 9.

The ANDA was prepared and assembled by Synthon BV, outside of the United States.  Marchetti Decl., ¶ 10.  Synthon Labs signed and filed ANDA No. 90-047 and made the ultimate

decision regarding which certification would be filed in connection with the ANDA with respect to the '703 Patent.  Marchetti Decl., ¶¶ 11, 13.

**C.    The Present Action**

On January 16, 2008, Synthon Labs' ANDA No. 90-047 ("Memantine ANDA"), seeking approval to manufacture and market its 5 milligram memantine hydrochloride tablet, was accepted for filing by the FDA.  Marchetti Decl., ¶ 12.

The Memantine ANDA included a certification pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV), commonly referred to as a "Paragraph IV Certification," that the '703 Patent was invalid, unenforceable or will not be infringed by the manufacture, use or sale of Synthon Labs' generic memantine product.  Marchetti Decl., ¶ 13.  As required, on February 4, 2008, Synthon Labs notified Plaintiffs of the filing of the Memantine ANDA, which notification was received on or about February 5, 2008, and included a detailed explanation of Synthon Labs' contention regarding non-infringement and invalidity of the '703 Patent.  Amended Complaint, ¶ 90; Marchetti Decl., ¶ 14.

Based on Synthon Labs' filing of the Mamentine ANDA, and within 45 days of receiving notification of the included Paragraph IV Certification, Plaintiffs filed the instant action alleging patent infringement pursuant to 35 U.S.C. § 271(e)(2).  Amended Complaint, ¶ 91.

**II.
ARGUMENT**

**A.
THIS ACTION SHOULD BE DISMISSED BASED ON LACK OF PERSONAL
JURISDICTION OVER THE SYNTHON ENTITIES**

The Synthon Entities respectfully request dismissal of this action pursuant to Fed. R. Civ P. 12(b)(2), because this Court does not have personal jurisdiction over them.  Once the issue is

8

raised, the plaintiff bears the burden of establishing that jurisdiction exists over the challenging

defendant. *Physician Endorsed LLC v. Clark*, 374 F. Supp. 2d 395, 398 (D. Del. 2005) (citation

omitted). Based on the allegations of the complaint and the facts as set forth above, this Court

does not have personal jurisdiction over any of the Synthon Entities, thus, this action should be

dismissed, or, in the alternative, transferred to a court with jurisdiction over the Synthon Entities.

1.    **There Is No Personal Jurisdiction Over the Synthon Entities in this Court**

Personal jurisdiction over a defendant can be either general or specific depending on the

quantity and quality of the defendant's contacts within the forum state. *Merck & Co. v. Barr

Labs., Inc.*, 179 F. Supp. 2d 368, 371 (D. Del. 2002).[3] Plaintiff must show that the defendant's

contacts with the forum are "continuous and systematic" in order to permit the exercise of

general jurisdiction. *Id.* Specific jurisdiction over the defendant is permitted if the cause of

action arises out of the defendant's minimum contacts within the forum state. *Id.* Here, none of

the Synthon Entities maintains sufficient contacts within the forum to permit the exercise of

either general or specific jurisdiction over them in this Court. Thus, this action should be

dismissed pursuant to Fed. R. Civ. P. 12(b)(2).

a.    **There is no General Personal Jurisdiction Over the Synthon Entities in the
       District of Delaware**

To exercise general jurisdiction over a defendant, the defendant must have "continuous

and systematic" contacts within the forum, here the District of Delaware. *M&M Techs., Inc. v.

Gurtler Chems., Inc.*, No. 03-994, 2005 U.S. Dist. LEXIS 1726, at *7 (D. Del. February 8, 2005)

(Sleet, J.). Specifically, the particular defendant must regularly transact or solicit business within

---

[3]    Federal Circuit law applies to the determination of whether or not personal jurisdiction exists over a
defendant in a patent infringement action. *Akro Corp. v. Luker*, 45 F.3d 1541, 1543 (Fed. Cir. 1995),
*cert. denied*, 515 U.S. 1122 (1995).

the state, have an office within the state, have a license to do business within the state, manufacture, sell, market, or distribute a product in the state, lease or own real property in the state, or some other similar regular and established contact with the forum. *Monsanto Co. v. Syngenta Seeds, Inc.*, No. 04-305, 2006 U.S. Dist. LEXIS 54534, at *18 (D. Del. August 4, 2006). Because none of the Synthon Entities has the quality and quantity of contacts within Delaware required to meet this rigorous standard, general jurisdiction can not properly be exercised over them here.

Synthon Holding is a Dutch company, with its principal place of business in the Netherlands. Amended Complaint, ¶ 16; van Uchelen Decl., ¶¶ 4-5. Synthon Holding does not sell products or solicit business within the State of Delaware, nor is it licensed to do business in the State. van Uchelen Decl., ¶ 6. Synthon Holding does not maintain any bank account, mailing address or telephone number in the State of Delaware, nor in the United States as a whole. *Id.* Synthon Holding does not own or lease any real property in the State of Delaware. *Id.*, at ¶ 6.

Synthon BV is also a Dutch company, with its principal place of business in the Netherlands. Amended Complaint, ¶ 17; van Uchelen Decl., ¶ 8. Synthon BV has no contacts with any company located in the State of Delaware. van Uchelen Decl., ¶ 10. Synthon BV does not sell products or solicit business within the State of Delaware, nor is it licensed to do business in the State. van Uchelen Decl., ¶ 10. Synthon BV does not maintain any bank account, mailing address or telephone number in the State of Delaware. *Id.* Synthon BV does not own or lease any real property in the State of Delaware. *Id.*, at ¶ 10. Thus, Synthon BV is not subject to general personal jurisdiction in this District.

Synthon Labs is a Virginia corporation, with its principal place of business in Gainesville, Virginia. Amended Complaint, ¶ 18; Marchetti Decl., ¶ 2. Synthon Labs does not sell products in this District, nor anywhere else. Marchetti Decl., ¶ 4. Synthon Labs is not licensed to do business within the State of Delaware. *Id.* Synthon Labs does not hold any bank accounts, and it does not have a mailing address or telephone number within the State of Delaware. *Id.* Synthon Labs does not lease or own any real property within the State of Delaware. *Id.* Synthon Labs is not subject to the general personal jurisdiction of this Court.

Finally, Synthon Pharms is a North Carolina corporation with its principal place of business in North Carolina. Amended Complaint, ¶ 19; Hinckle Decl., ¶ 2. Synthon Pharms does not hold a license to do business in the State. Hinckle Decl., ¶ 3. Synthon Pharms does hold a Drug Wholesalers License, issued by the Delaware Pharmacy Board, as an out of state wholesale distributor to permit others (mainly drug wholesalers) to ship product into the state. *Id.*, at ¶ 4. However, Synthon Pharms has not made any direct sale into the State of Delaware. *Id.* Synthon Pharms does not have any contracts with companies that are located in Delaware. Hinckle Decl., ¶ 3. Synthon Pharms does not employ a sales force, and, even when it did (at a time prior to the filing of the Amended Complaint), it did not have any representative located in the State of Delaware. *Id.*, at ¶ 6. Synthon Pharms does not own or lease real property in the State of Delaware. *Id.*, at ¶ 3. Thus, Synthon Pharms does not have contacts with the State of Delaware that could be characterized as "continuous and systematic" under the required rigorous standard, and is, as a result, not subject to general personal jurisdiction in this District.

None of the Synthon Entities maintain contacts within the State of Delaware, much less contacts that could be characterized as "continuous and systematic." Thus, there is no general personal jurisdiction over them in this Court.

11

b.    **There is No Specific Jurisdiction Over the Synthon Entities in this District[4]**

Under Federal Circuit law, the determination of whether specific personal jurisdiction

exists over a defendant involves a two-step inquiry.  *Inamed Corp. v. Kuzmak*, 249 F.3d 1356,

1359 (Fed. Cir. 2001).  First, one must determine whether the forum state's long-arm statute

permits jurisdiction, and, second, whether jurisdiction, if exercised, would comport with

constitutional due process requirements.  *Id.*  Although "[t]he Delaware Supreme Court has

construed the long-arm statute broadly to confer jurisdiction to the maximum extent possible

under the Due Process Clause," it "has not collapsed the analysis under the Delaware long-arm

statute into the constitutional due process analysis."  *Merck & Co., Inc. v. Barr Labs.*, Inc., 179

F. Supp. 2d 368, 372 (D. Del. 2002); *ICT Pharms., Inc. v. Boehringer Ingelheim Pharms., Inc.*,

147 F. Supp. 2d 268, 271 n4 (D. Del. 2001).  Here, because neither the Delaware long-arm

statute nor the constitutional due process requirements allows for specific personal jurisdiction,

the Synthon Entities request that their motion to dismiss be granted.

(i)    The Delaware Long-Arm Statute Does Not Apply to the Synthon Entities

"The first step in the court's analysis is to determine whether any of the provisions of

Delaware's long-arm statute, [10 Del. C. § 3104] warrant the exercise of jurisdiction over" the

Synthon Entities.  *M&M Techs., Inc.*, 2005 U.S. Dist. LEXIS 1726, at *7.  The Delaware long-

arm statute reads, in pertinent part:

(c) . . . a court may exercise personal jurisdiction over any nonresident . . . who. . .
(1) Transacts any business or performs any character of work or service in the
State; . . .
(3) Causes tortious injury in the State by an act or omission in this State;

---

[4]  Plaintiffs do not allege facts supporting specific jurisdiction over the Synthon Entities, but, rather,
allege facts indicating that they relied on a general jurisdiction theory in the allegations.  *See* Amended
Complaint, ¶¶ 16-19, 22, 34-37.  However, in order to fully address the issue, the Synthon Entities
demonstrate below that this Court does not have specific jurisdiction over them either.

12

> (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State . . .

10 Del. C. § 3104(c).

> (a)    10 Del. C. § 3104(c)(1) and (c)(3) Do Not Apply to Confer Jurisdiction Over the Synthon Entities

"The Delaware Supreme Court has interpreted subsections (c)(1) and (c)(3) as specific jurisdiction provisions that require a 'nexus' between the plaintiff's cause of action and the conduct of the defendant that is used as a basis for jurisdiction." *Energy Trans. Group, Inc. v. William Demant Holding, A/S*, No. 05-422, 2008 U.S. Dist. LEXIS 845, *7 (D. Del. Jan. 4, 2008) (citation omitted) (Sleet, J.).    When assessing the applicability of either of these specific jurisdiction provisions of the Delaware long-arm statute, it is essential at a minimum to establish that, "some act must [have] actually occur[red] in Delaware." *Reach & Assocs., P.C. v. Dencer*, 269 F. Supp. 2d 497, 503 (D. Del. 2003) (citation omitted).

Here, none of the activity giving rise to this litigation occurred in the State of Delaware. Specifically, Synthon BV developed the memantine hydrochloride product that is the subject of the ANDA at issue in this action.    van Uchelen Decl., ¶ 11, Marchetti Decl., ¶ 5.    All of that development work occurred outside of the United States, in the Netherlands and in Europe. Marchetti Decl., ¶ 6. The batches of product which were manufactured in support of the ANDA were manufactured by a third party outside of the United States.    Marchetti Decl., ¶ 7.    The quality control and stability studies were performed by either Synthon BV, or by third party laboratories outside of the United States. Marchetti Decl., ¶ 8. The *in vitro* testing performed in support of the ANDA was performed at the direction of Synthon BV, outside of the Untied States.    Marchetti Decl., ¶ 9.    The ANDA was prepared and assembled outside of the United

13

States by Synthon BV. Marchetti Decl., ¶ 10. The ANDA was signed and filed by Synthon Labs, a corporation located in Virginia, at the FDA, located in Maryland. Marchetti Decl., ¶¶ 2, 11. Synthon Labs also made the final decision regarding which certification would be filed in connection with the ANDA with respect to the '703 Patent. Marchetti Decl., ¶ 13.

Thus, it is clear that none of the activity that could arguably have a nexus to the alleged infringing activity in this action occurred in Delaware. That is, none of these activities was "directed at residents of Delaware and the protection of Delaware laws." *Energy Transportation Grp., Inc.*, 2008 U.S. Dist. LEXIS 845, at *7. As a result, neither subsections (c)(1) or (c)(3) of the Delaware long-arm statute applies to confer personal jurisdiction over any of the Synthon Entities.

                (b)      10 Del. C. § 3104(c)(4) Does Not Apply to Confer Jurisdiction Over the Synthon Entities

"Delaware courts have interpreted § 3104 (c)(4) as a general jurisdiction provision." *M&M Techs., Inc.*, 2005 U.S. Dist. LEXIS 1726, at *11 (citation omitted). To apply this subsection to confer jurisdiction over a nonresident, there must be a showing that the nonresident defendant engaged in a "persistent course of conduct." *Physician Endorsed LLC*, 374 F. Supp. 2d at 398. "While seemingly broad, the standard for general jurisdiction is high in practice and not often met." *Reach & Assocs., P.C.*, 269 F. Supp. 2d at 505. *See also*, *Intel Corp. v. Silicon Storage Tech., Inc.*, 20 F. Supp. 2d 690, 699 (D. Del. 1998) (citation omitted). The types of conduct which can form the basis of personal jurisdiction under this subsection are similar to those which form the basis of general personal jurisdiction and include, *inter alia*, conducting business in Delaware, being registered to do business in the State, holding bank accounts, telephone listings or property in Delaware, and deriving a substantial portion of revenue in the

State. *Monsanto Co.*, 2006 U.S. Dist. LEXIS 54534, at *18; *Reach & Assocs., P.C.*, 269 F. Supp. 2d at 505.

Here, as discussed in more detail above in Section II.A.1.a, none of the Synthon Entities has engaged in a persistent course of conduct in the State of Delaware. Synthon Holding does not sell any product, solicit business, or hold any bank account, mailing address or telephone number in the State. van Uchelen Decl., ¶ 6. Synthon BV has no contact with any company located in the State of Delaware. *Id.*, ¶ 10. Synthon Labs does not sell product and is not licensed to do business in the State. Marchetti Decl., ¶ 4. Synthon Labs also does not hold bank accounts, a mailing address or any telephone listing in the State. *Id.* Synthon Pharms does not hold a license to do business in the State, has not made any direct sale in the State, has no contracts with companies located in Delaware, and has never retained a sales representative in the State. Hinckle Decl., ¶¶ 3-4, 6. Moreover, the only continuing contact Synthon Pharms has with the State, its Drug Wholesalers License, is insufficient to establish a persistent course of conduct within the State. *Id.*, at ¶ 4; *Merck & Co., Inc.*, 179 F. Supp. 2d at 373 (the Court held that a generic pharmaceutical company did not have sufficient contacts to permit the exercise of jurisdiction under this subsection even though it held a Drug Wholesalers License, had an account manager assigned to the State who visited about three times a year, had a contract with a Delaware entity, and even maintained a wholly-owned subsidiary in the State).

Thus, neither the specific nor general jurisdiction subsections of the Delaware long-arm statute are applicable to confer jurisdiction over the Synthon Entities under the facts of this case. As a result, this action should be dismissed.

**2.     The Assertion of Personal Jurisdiction Over the Synthon Entities Would Not be Reasonable and Would Violate Due Process**

The question of whether or not the exercise of jurisdiction would be reasonable – the due process test – is not reached unless one of the first two factors required to confer jurisdiction are met. *Viam Corp. v. Iowa Exp.-Imp. Trading Co.*, 84 F.3d 424, 429 (Fed. Cir. 1996) (citation omitted); *Energy Transp. Group, Inc.*, 2008 U.S. Dist. LEXIS 845, at *14. As explained above, none of those factors are met in this case. However, to be complete, an analysis of the reasonableness of exercising jurisdiction over the Synthon Entities is set forth below.

The due process inquiry considers the following factors: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interests in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Physician Endorsed LLC*, 374 F. Supp. 2d at 399 (citation omitted).

### a.     The Burden On The Synthon Entities

The burden on the Synthon Entities in litigating the current dispute in this District is high since the exercise of jurisdiction here would force them to litigate in a foreign forum. This is particularly true for Synthon Holding and Synthon BV, corporations located and existing outside of the United States. *Monsanto Co.*, 2006 U.S. Dist. LEXIS 54534, at *17 (citation omitted). Synthon Labs is located in Virginia and Synthon Pharms is located in North Carolina. Marchetti Decl., ¶ 2; Hinckle Decl., ¶ 2. Thus, this factor in the due process analysis weighs **against** exercising personal jurisdiction over the Synthon Entities.

### b.     The District of Delaware's Interests in Adjudicating the Dispute

Although Forest Labs is a Delaware corporation, it is not located in the State. Amended Complaint, ¶ 1. The remainder of the parties to the litigation are both incorporated and located

16

outside of Delaware.  Amended Complaint, ¶¶ 2-4; 16-19.  In addition, because this action is based on the filing of an ANDA, none of the traditional patent infringement related injuries to the citizens of the State are implicated.  No alleged wrong to the citizens of Delaware has occurred that the court would have an interest in eliminating.  As a result, this District has little interest in adjudicating the dispute here, and this factor also weighs **against** exercising personal jurisdiction over the Synthon Entities.

      **c.**      **The Plaintiffs' Interests in Obtaining Convenient and Effective Relief**

The Plaintiffs will obtain no more or less convenient and effective relief in this forum than they would in any other since none of the Plaintiffs are located within the State.  Thus, this factor weighs **against** this district exercising personal jurisdiction over the Synthon Entities.

      **d.**      **The Interstate Judicial System's Interest in Obtaining the Most Efficient Resolution of the Controversy**

This factor considers the location of the witnesses and the evidence.  Here, none of the relevant witnesses or documents are located in Delaware.  Marchetti Decl., ¶¶ 5-14.  The focus of the alleged infringement claim will be the product that will be manufactured once Synthon Labs' ANDA is approved, and witnesses and documents with respect to those facts are located at Synthon BV in the Netherlands.  Marchetti Decl., ¶¶ 5-9.  Evidence and witnesses with respect to the filing of the ANDA will  be located in the Netherlands and in Virginia.  van  Uchelen Decl., ¶ 1; Marchetti Decl., ¶¶ 10-11.  To the extent that Synthon Pharms has any information related to the ANDA at issue here, that information is located in North Carolina.  Hinckle Decl., ¶ 9.  Thus, because none of the relevant witnesses or documentation is located within Delaware, this factor also weighs **against** exercise of personal jurisdiction over the Synthon Entities.

      **e.**      **The Shared Interest of the States in Furthering Substantive Social Policies**

There are no fundamental state-based social policies that would be of particular interest here, because this case is based solely on federal patent law. *Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.*, 444 F.3d 1356, 1368 (Fed. Cir. 2006), *reh'g denied*, 2006 U.S. App. LEXIS 14551 (Fed. Cir. May 30, 2006). Thus, this factor is neutral in the analysis.

The due process factors end with four of five factors weighing against an exercise of personal jurisdiction over the Synthon Entities in this District and one factor neutral in the analysis. Thus, in addition to the fact that the Delaware long-arm statute does not confer jurisdiction over the Synthon Entities, the due process analysis ends with the conclusion that such an exercise would not "be fair and just." *Mylan Pharms., Inc. v. Kremers Urban Dev. Co.*, No. 02-1628, 2003 U.S. Dist. LEXIS 5728, at *7 (D. Del. Apr. 7, 2003).

**B.**
**THIS ACTION SHOULD BE DISMISSED BASED ON IMPROPER VENUE**

The Synthon Entities respectfully request dismissal of this action pursuant to Fed. R. Civ. P. 12(b)(3) because venue in the United States District Court for the District of Delaware is improper. The Synthon Entities bear the burden of establishing that venue is improper. *Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 516 F. Supp. 2d 324, 332 (D. Del. 2007).

Pursuant to 28 U.S.C. § 1400(b), venue is proper "in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." 28 U.S.C. § 1400(b) (emphasis added). As further defined by 28 U.S.C. § 1391(c), a corporation is "deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." 28 U.S.C. § 1391(c).[5]

---

[5] As to Synthon Holding and Synthon BV, as Dutch companies, venue is proper "in any district." 28 U.S.C. § 1391(d). However, when the action includes both alien defendants and at least one non-alien defendant, "venue for the entire action is proper in any district where it is correct as to the non-alien

As set forth above in Sections II.A.1., there is neither general nor specific personal jurisdiction over any of the Synthon Entities in this Court. Moreover, even if there were personal jurisdiction of either type over the Synthon Entities, the exercise of such jurisdiction would not meet due process. *See* Section II.A.2., *supra*. Thus, since this Court does not have personal jurisdiction over the Synthon Entities, venue is not proper here and this case should be dismissed, or, in the alternative, transferred to the EDVA. 28 U.S.C. § 1391(c); 28 U.S.C. § 1406(a).

## C.
## THIS ACTION SHOULD BE DISMISSED BASED ON INSUFFICIENT SERVICE OF PROCESS PURSUANT TO FED. R. CIV. P. 12(b)(5)

In this action, Plaintiffs served the Summons and Amended Complaint against each of the Synthon Entities (two of which are located outside of the United States) on the Delaware Secretary of State, pursuant to 10 Del. C § 3104(d), on February 20, 2008. Pursuant to that statute, Plaintiffs then filed the return of service documents with the court on February 21, 2008. 10 Del. C § 3104(d). In order to comply with the statute, on that same day, Plaintiffs forwarded, *by registered mail*, a copy of the Summons and Amended Complaint, along with a statement that service was made on the Secretary of State to each of the Synthon Entities. *Id.* Plaintiffs then filed declarations of mailing with respect to both Synthon Labs and Synthon Pharms, as required by Local Rule 4.1(b). *See* Declaration of Mailing (as to Synthon Laboratories, Inc.), D.I. 43 and Declaration of Mailing (as to Synthon Pharmaceuticals, Inc.), D.I. 45. As of March 12, 2008, just prior to the filing of this motion, no declaration of mailing has been filed with respect to the service on either Synthon Holding or Synthon BV. Thus, none of the Synthon Entities even had

---

defendant." *Japan Gas Lighter Assoc. v. Ronson Corp.*, 257 F. Supp. 219, 225 (D. N.J. 1966). Thus, because this District is not the proper venue with respect to Synthon Pharms or Synthon Labs, it is not proper for Synthon Holdings and Synthon BV.

notice of the filed action until, *at the earliest*, February 26, 2008. *See* D.I. 43, Exhibit B. Moreover, at this point, there is no proof that either Synthon Holding or Synthon BV has even been served with notice of the litigation.

As set forth above in Section II.A.1.b.(i), the Delaware long-arm statute does not confer jurisdiction over any of the Synthon Entities. Because this method of service was the only method of service executed by the Plaintiffs with respect to the Synthon Entities, process has not been properly served and a motion to dismiss under Fed. R. Civ. P. 12(b)(5) should be granted. *La Chemise Lacoste v. General Mills, Inc.*, 53 F.R.D. 596, 603 (D. Del. 1971) (granting a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(5) when the long-arm statute purportedly applied to permit service did not confer jurisdiction over the defendant).

### D.
### IN THE ALTERNATIVE, THIS CASE SHOULD BE TRANSFERRED TO THE EDVA PURSUANT TO 28 U.S.C. § 1406(a)

"[W]hen venue never existed in the district where the suit was filed, section 1406(a) governs." *FS Photo, Inc. v. Picturevision*, 48 F. Supp. 2d 442, 449 (D. Del. 1999) (citation omitted). That section requires that, if venue is improper, the court either dismiss the action "or if it be in the interests of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). If the Court determines that the interests of justice would be better served by transfer, rather than dismissal, the Synthon Entities submit that the EDVA is a district in which the case could have been brought and is a proper forum.[6]

---

[6] In the event the Court believes the interests of justice would be better served by transfer of this action to the EDVA, none of the Synthon Entities would contest jurisdiction in that District.

**CONCLUSION**

For the reasons set forth above, the Synthon Entities' motion to dismiss this action, or in the alternative to transfer this action to the EDVA, should be granted.

Dated:  March 12, 2008                            _____/s/ Elizabeth M. McGeever_____
                                                  Elizabeth M. McGeever(# 2057)
                                                  Melissa N. Donimirski (# 4701)
                                                  PRICKETT, JONES & ELLIOT, P.A.
                                                  1310 King Street
                                                  Wilmington, DE  19899
                                                  Telephone: (302) 888-6500
                                                  Facsimile: (302) 658-8111
                                                  emmcgeever@prickett.com

                                                  *Attorney for Defendants*
                                                  *Synthon Holding B.V.,*
                                                  *Synthon B.V.,*
                                                  *Synthon Laboratories, Inc. and*
                                                  *Synthon Pharmaceuticals, Inc.*

*Of Counsel*:

E. Anthony Figg
Joseph A. Hynds
Lisa N. Phillips
ROTHWELL, FIGG, ERNST & MANBECK, P.C.
1425 K Street, N.W.
Suite 800
Washington, D.C. 20005
Telephone: (202) 783-6040
Facsimile: (202) 783-6031
efigg@rothwellfigg.com
jhynds@rothwellfigg.com
lphillips@rothwellfigg.com

EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| FOREST LABORATORIES, INC., FOREST LABORATORIES HOLDINGS, LTD., MERZ PHARMA GMBH & CO. KGAA, and MERZ PHARMACEUTICALS GMBH,<br><br>   Plaintiffs,<br><br>v.<br><br>DR. REDDY'S LABORATORIES, INC., DR. REDDY'S LABORATORIES LIMITED, GENPHARM IC., GENPHARM, L.P., INTERPHARM HOLDINGS, INC., INTERPHARM, INC., MYLAN PHARMACETICALS INC., RANBAXY INC., RANBAXY LABORATORIES LIMITED, KENDLE INTERNATIONAL INC., SUN INDIA PHARMACEUTICAL INDUSTRIES LIMITED (a/k/a SUN PHARMACEUTICAL INDUSTRIES LTD.), SYNTHON HOLDING B.V., SYNTHON B.V., SYNTHON LABORATORIES, INC., and SYNTHON PHARMACEUTICALS, INC.<br><br>   Defendants. | C.A. No. 08-52 (GMS) |

**DECLARATION OF ANTHONIE O.F. CROISET VAN UCHELEN IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(2), 12(b)(3) AND 12(b)(5), OR, IN THE ALTERNATIVE, TO TRANSFER**

I, Anthonie O.F. Croiset van Uchelen, declare and state as follows:

1.      I am General Counsel of Synthon Holding BV ("Synthon Holding").  I am

authorized to make this declaration on behalf of Synthon Holding.  I submit this

declaration in support of the motion filed by Defendants Synthon Holding, Synthon



B.V. ("Synthon"), Synthon Laboratories, Inc. ("Synthon Labs"), and Synthon Pharmaceuticals, Inc. ("Synthon Pharms") (collectively, the "Synthon Entities") to dismiss or, in the alternative, to transfer this action. I have personal knowledge of the facts set forth in this declaration and am competent to testify to such facts.

**A.      The Synthon Entities' Corporate Structure**

2.      The corporate structure of all of the Synthon Entities, including those that are correctly not named as Defendants here, is as follows: Synthon Holding is the ultimate parent of all of the Synthon Entities; Synthon International Holding BV and Synthon Netherlands Holding BV have Synthon Holding as their direct parent, but they are not directly related; Synthon Luxembourg Holding SARL and Synthon Pharmaceuticals, Inc. ("Synthon Pharms") have Synthon International Holding BV as their direct parent; Synthon Laboratories, Inc.'s ("Synthon Labs") direct parent is Synthon Luxembourg Holding SARL; Synthon BV's direct parent is Synthon Netherlands Holding BV. <u>See</u> Exhibit A.

3.      Accordingly, there is no direct relationship between Synthon BV, Synthon Pharms and Synthon Labs.

**B.      Synthon Holding and Its Lack of Contact With This District and to This Action**

4.      Synthon Holding is a Dutch company.

5.      Synthon Holding's principal place of business is located in the Netherlands.

6.      Synthon Holding does not sell products or solicit business within the

2



District of Delaware, nor is it licensed to do business in the State of Delaware (or in the United States as a whole). In addition, Synthon Holding does not own or lease any real property in the State, maintain any bank account, mailing address or telephone number in the District, or in the United States as a whole.

7.      Synthon Holding has taken no intentional action aimed at the District of Delaware and it was not involved in the activities which give rise to this action (beyond those activities normally associated with majority shareholders) – neither during development of the product, nor during the assembly and subsequent filing of the ANDA.

**C.      Synthon BV and its Activities**

8.      Synthon BV is a Dutch company with its principal place of business in Nijmegen, in the Netherlands.

9.      Synthon BV maintains contacts with Synthon Pharms, but, those contacts are outside of the District of Delaware since Synthon Pharms' offices, mailing address, and phone listings are all located in North Carolina.

10.      To the best of my knowledge, Synthon BV has no contacts with any entity that is physically located within the District of Delaware. Synthon BV does not sell products or solicit business in the State of Delaware. Synthon BV does not own or lease any real property in the State, or maintain any bank account, mailing address or telephone number in the District.

11.      The generic memantine hydrochloride tablet, the basis for the ANDA at

3



issue in this litigation, was developed exclusively by, or on behalf of, Synthon BV, and was licensed to Synthon Labs at its request.

12.     Synthon BV performed all of the development work, including all of the testing required in support of the ANDA, in the Netherlands and with third party contractors located in Germany and elsewhere in Europe.


I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing statements are true and correct.


Executed this 12th day of March, 2008

_____
Anthonie O.F. Croiset van Uchelen



# EXHIBIT A



**Relevant Synthon Corporate Structure**



EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| FOREST LABORATORIES, INC., FOREST LABORATORIES HOLDINGS, LTD., MERZ PHARMA GMBH & CO. KGAA, and MERZ PHARMACEUTICALS GMBH, | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | C.A. No. 08-52 (GMS) |
| v. | ) ) | |
| DR. REDDY'S LABORATORIES, INC., DR. REDDY'S LABORATORIES LIMITED, GENPHARM IC., GENPHARM, L.P., INTERPHARM HOLDINGS, INC., INTERPHARM, INC., MYLAN PHARMACETICALS INC., RANBAXY INC., RANBAXY LABORATORIES LIMITED, KENDLE INTERNATIONAL INC., SUN INDIA PHARMACEUTICAL INDUSTRIES LIMITED (a/k/a SUN PHARMACEUTICAL INDUSTRIES LTD.), SYNTHON HOLDING B.V., SYNTHON B.V., SYNTHON LABORATORIES, INC., and SYNTHON PHARMACEUTICALS, INC. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**DECLARATION OF JOSEPH MARCHETTI IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(2),
12(b)(3) AND 12(b)(5), OR, IN THE ALTERNATIVE, TO TRANSFER**

I, Joseph Marchetti, declare and state as follows:

1.     I am the President of Synthon Laboratories, Inc. ("Synthon Labs") and have

held this position since Synthon Labs' inception on November 14, 2003. I am authorized

to make this declaration on behalf of Synthon Labs. I submit this declaration in support

of the motion filed by the Synthon Entities to dismiss or, in the alternative, to transfer this action. I have personal knowledge of the facts set forth in this declaration and am competent to testify to such facts.

**A.    Synthon Labs**

2.    Synthon Labs is a Virginia corporation with its principal place of business located at 7130 Heritage Village Plaza, Suite 201, Gainesville, Virginia 20155, within the Eastern District of Virginia.

3.    Synthon Labs' direct parent company is Synthon Luxembourg Holding SARL, whose direct parent company is Synthon International Holding BV. Synthon Labs' ultimate parent is Synthon Holding BV.

4.    Synthon Labs does not sell any products. Synthon Labs does not solicit business in the District of Delaware. Synthon Labs is not licensed to do business in the State of Delaware. In addition, Synthon Labs does not own or lease any real property, maintain any bank account, mailing address or telephone number in the State of Delaware.

**B.    Development and Testing of the Memantine Hydrochloride Formulation**

5.    Synthon BV developed the memantine hydrochloride formulation which is the basis for Synthon Labs' ANDA No. 90-047 (the "Memantine ANDA").

6.    All of Synthon BV's development work occurred solely in the Netherlands or at third party locations in Europe. All of the development work was directed by Synthon BV.

7.      The batches of memantine hydrochloride product that were manufactured to support the Memantine ANDA were made by a manufacturer outside of the United States.

8.      Synthon BV directed third parties outside of the United States to conduct the quality control and stability studies which were ultimately submitted in support of the Memantine ANDA.

9.      Synthon BV directed third parties outside of the United States to perform the *in vitro* testing necessary to support the Memantine ANDA. That testing was completed outside of the United States.

**C.      The Memantine ANDA, No. 90-047**

10.     Synthon BV wrote and assembled the Memantine ANDA in the Netherlands.

11.     Synthon Labs signed and filed the Memantine ANDA with the FDA, located in Maryland. When the Memantine ANDA is approved, Synthon Labs will be the sole ANDA holder.

12.     The FDA accepted the Memantine ANDA seeking approval to manufacture and market Synthon Labs' 5mg memantine hydrochloride tablet for filing on January 16, 2008.

13.     The Memantine ANDA included a Paragraph IV certification stating that the '703 Patent is invalid, unenforceable, and/or will not be infringed by the manufacture, use or sale of Synthon Labs' generic memantine hydrochloride product. The decision

regarding which certification to file with respect to the '703 Patent was made by Synthon Labs.

14.    On February 4, 2006, Synthon Labs notified Plaintiffs of the filing of ANDA No. 90-047 on the 5mg strength of memantine hydrochloride tablets, which notification included a detailed explanation of Synthon Labs' contentions regarding noninfringement and invalidity of the '703 Patent.


I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing statements are true and correct.


Executed this 12th day of March, 2008


Joseph Marchetti

EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FOREST LABORATORIES, INC., FOREST LABORATORIES HOLDINGS, LTD., MERZ PHARMA GMBH & CO. KGAA, and MERZ PHARMACEUTICALS GMBH, <br><br> Plaintiffs, <br><br> v. <br><br> DR. REDDY'S LABORATORIES, INC., DR. REDDY'S LABORATORIES LIMITED, GENPHARM IC., GENPHARM, L.P., INTERPHARM HOLDINGS, INC., INTERPHARM, INC., MYLAN PHARMACETICALS INC., RANBAXY INC., RANBAXY LABORATORIES LIMITED, KENDLE INTERNATIONAL INC., SUN INDIA PHARMACEUTICAL INDUSTRIES LIMITED (a/k/a SUN PHARMACEUTICAL INDUSTRIES LTD.), SYNTHON HOLDING B.V., SYNTHON B.V., SYNTHON LABORATORIES, INC., and SYNTHON PHARMACEUTICALS, INC. <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 08-52 (GMS) |

## DECLARATION OF MICHAEL H. HINCKLE IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(2), 12(b)(3) AND 12(b)(5), OR, IN THE ALTERNATIVE, TO TRANSFER

I, Michael H. Hinckle, declare and state as follows:

1.    I am the Vice President and General Counsel of Synthon Pharmaceuticals,

Inc. ("Synthon Pharms"). I am authorized to make this declaration on behalf of Synthon

Pharms. I have been an officer of Synthon Pharms since September 15, 2003. I submit

this declaration in support of the motion filed by the Synthon Entities to dismiss or, in the alternative, to transfer this action. I have personal knowledge of the facts set forth in this declaration and am competent to testify to such facts.

### A.    Synthon Pharms and its Business Activities

2.    Synthon Pharms is a North Carolina corporation with its principal place of business located at 9000 Development Drive, Research Triangle Park, North Carolina, 27709.

3.    Synthon Pharms does not solicit business in the District of Delaware and does not have contracts with any company located in the State of Delaware. Synthon Pharms is not licensed to do business in the State of Delaware. In addition, Synthon Pharms does not own or lease any real property, maintain any bank account, mailing address or telephone number in the State of Delaware.

4.    Synthon Pharms has not directly sold any product to customers in the State of Delaware. Synthon Pharms holds a Drug Wholesalers License in the State of Delaware, issued by the Delaware Pharmacy Board, in order to permit others (mainly drug wholesalers) to ship product into the State of Delaware.

5.    Since February, 2004, Synthon Pharms has paid $38.55 in rebates to Delaware Medicaid. These rebates were paid for drug products dispensed in the second and third quarters of 2005. Thus, in those quarters, Medicaid beneficiaries in Delaware were dispensed a total of 120 tablets (90 tablets in one quarter and 30 tablets in the other) of drug products from Delaware pharmacies. Because Synthon Pharms has never

shipped directly to a Delaware location, those pharmacies (or a single pharmacy) must have received our product directly from a distributor outside of Delaware.

6.     Synthon Pharms does not have a sales force, and, when it did, it did not have a representative in the State of Delaware.

**B.     Synthon Pharms' Limited Involvement in the Memantine ANDA**

7.     Prior to the filing of ANDA No. 90-047 seeking approval to manufacture and market Synthon Labs' 5mg memantine hydrochloride tablet (the "Memantine ANDA"), Synthon Pharms communicated with the FDA regarding what types of testing would be required to demonstrate bioequivalence to the Namenda® product and reported the FDA's response to Synthon BV.

8.     Synthon Pharms has also reviewed and commented on the Memantine ANDA and continues to provide an advisory role for Synthon BV with respect to, *inter alia*, regulatory requirements.

9.     All of the Synthon Pharms' activities with respect to the Memantine ANDA have been performed in North Carolina, outside of the District of Delaware.  All of the witnesses knowledgeable with respect to those activities and the information relating to those activities are located in North Carolina.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing statements are true and correct.

Executed this 12th day of March, 2008

_Michael H. Hinckle_

Michael H. Hinckle

**EXHIBIT D**



# Namenda
## memantine HCl

**Tablets/Oral Solution**
**Rx Only**

## DESCRIPTION
Namenda® (memantine hydrochloride) is an orally active NMDA receptor antagonist. The chemical name for memantine hydrochloride is 1-amino-3,5-dimethyladamantane hydrochloride with the following structural formula:

$$NH_2 \cdot HCl$$

The molecular formula is $C_{12}H_{21}N \cdot HCl$ and the molecular weight is 215.76.

Memantine HCl occurs as a fine white to off-white powder and is soluble in water. Namenda is available as tablets or as an oral solution. Namenda is available for oral administration as capsule-shaped, film-coated tablets containing 5 mg and 10 mg of memantine hydrochloride. The tablets also contain the following inactive ingredients: microcrystalline cellulose/colloidal silicon dioxide, talc, croscarmellose sodium, and magnesium stearate. In addition the following inactive ingredients are also present as components of the film coat: hypromellose, titanium dioxide, polyethylene glycol 400, FD&C yellow #6 and FD&C blue #2 (5 mg tablets), and hypromellose, titanium dioxide, macrogol/polyethylene glycol 400 and iron oxide black (10 mg tablets). Namenda oral solution contains memantine hydrochloride in a strength equivalent to 2 mg of memantine hydrochloride in each mL. The oral solution also contains the following inactive ingredients: sorbitol solution (70%), methyl paraben, propylparaben, propylene glycol, glycerin, natural peppermint flavor #104, citric acid, sodium citrate, and purified water.

## CLINICAL PHARMACOLOGY
### Mechanism of Action and Pharmacodynamics
Persistent activation of central nervous system N-methyl-D-aspartate (NMDA) receptors by the excitatory amino acid glutamate has been hypothesized to contribute to the symptomatology of Alzheimer's disease. Memantine is postulated to exert its therapeutic effect through its action as a low to moderate affinity uncompetitive (open-channel) NMDA receptor antagonist which binds preferentially to the NMDA receptor-operated cation channels. There is no evidence that memantine prevents or slows neurodegeneration in patients with Alzheimer's disease.

Memantine showed low to negligible affinity for GABA, benzodiazepine, dopamine, adrenergic, histamine and glycine receptors and for voltage-dependent $Ca^{2+}$, $Na^+$ or $K^+$ channels. Memantine also showed antagonistic effects at the $5HT_3$ receptor with a potency similar to that for the NMDA receptor and blocked nicotinic acetylcholine receptors with one-sixth to one-tenth the potency.

In vitro studies have shown that memantine does not affect the reversible inhibition of acetylcholinesterase by donepezil, galantamine, or tacrine.

### Pharmacokinetics
Memantine is well absorbed after oral administration and has linear pharmacokinetics over the therapeutic dose range. It is excreted predominantly in the urine, unchanged, and has a terminal elimination half life of about 60-80 hours.

### Absorption and Distribution
Following oral administration memantine is highly absorbed with peak concentrations reached in about 3-7 hours. Food has no effect on the absorption of memantine. The mean volume of distribution of memantine is 9-11 L/kg and the plasma protein binding is low (45%).

### Metabolism and Elimination
Memantine undergoes partial hepatic metabolism. About 48% of administered drug is excreted unchanged in urine; the remainder is converted primarily to three polar metabolites which possess minimal NMDA receptor antagonistic activity: the N-glucuronide conjugate, 6-hydroxy memantine, and 1-nitroso-deaminated memantine. A total of 74% of the administered dose is excreted as the sum of the parent drug and the N-glucuronide conjugate. The hepatic microsomal CYP450 enzyme system does not play a significant role in the metabolism of memantine. Memantine has a terminal elimination half-life of about 60-80 hours. Renal clearance involves active tubular secretion moderated by pH dependent tubular reabsorption.

### Special Populations
Renal Impairment: Memantine pharmacokinetics were evaluated following single oral administration of 20 mg memantine HCl in 8 subjects with mild renal impairment (creatinine clearance, CLcr, >50 – 80 mL/min), 8 subjects with moderate renal impairment (CLcr 30 – 49 mL/min), 7 subjects with severe renal impairment (CLcr 5 – 29 mL/min) and 8 healthy subjects (CLcr > 80 mL/min) matched as closely as possible by age, weight and gender to the subjects with renal impairment. Mean $AUC_{0-\infty}$ increased by 4%, 60%, and 115% in subjects with mild, moderate, and severe renal impairment, respectively, compared to healthy subjects. The terminal elimination half-life increased by 18%, 41%, and 95% in subjects with mild, moderate, and severe renal impairment, respectively, compared to healthy subjects.

No dosage adjustment is recommended for patients with mild and moderate renal impairment. Dosage should be reduced in patients with severe renal impairment (See DOSAGE AND ADMINISTRATION).

---

### NAMENDA® Tablets/Oral Solution
### (memantine hydrochloride)

Hepatic Impairment: Memantine pharmacokinetics were evaluated following the administration of single oral doses of 20 mg in 8 subjects with moderate hepatic impairment (Child-Pugh Class B, score 7-9) and 8 subjects who were age-, gender-, and weight-matched to the hepatically-impaired subjects. There was no change in memantine exposure (based on $C_{max}$ and AUC) in subjects with moderate hepatic impairment as compared with healthy subjects. However, terminal elimination half-life increased by about 16% in subjects with moderate hepatic impairment as compared with healthy subjects. No dose adjustment is recommended for patients with mild and moderate hepatic impairment. Memantine should be administered with caution to patients with severe hepatic impairment as the pharmacokinetics of memantine have not been evaluated in that population.

Elderly: The pharmacokinetics of Namenda in young and elderly subjects are similar.

Gender: Following multiple dose administration of Namenda 20 mg b.i.d., females had about 45% higher exposure than males, but there was no difference in exposure when body weight was taken into account.

### Drug-Drug Interactions
Substrates of Microsomal Enzymes: In vitro studies indicated that at concentrations exceeding those associated with efficacy, memantine does not induce the cytochrome P450 isozymes CYP1A2, CYP2C9, CYP2E1 and CYP3A4/5. In addition, in vitro studies have shown that memantine produces minimal inhibition of CYP450 enzymes CYP1A2, CYP2A6, CYP2C9, CYP2D6, CYP2E1, and CYP3A4. These data indicate that no pharmacokinetic interactions with drugs metabolized by these enzymes are expected.

Inhibitors of Microsomal Enzymes: Since memantine undergoes minimal metabolism, with the majority of the dose excreted unchanged in urine, an interaction between memantine and drugs that are inhibitors of CYP450 enzymes is unlikely. Coadministration of Namenda with the AChE inhibitor donepezil HCl does not affect the pharmacokinetics of either compound.

Drugs Eliminated via Renal Mechanisms: Memantine is eliminated in part by tubular secretion. In vivo studies have shown that multiple doses of the diuretic hydrochlorothiazide/triamterene (HCTZ/TA) did not affect the AUC of memantine at steady state. Memantine did not affect the bioavailability of TA, and decreased AUC and $C_{max}$ of HCTZ by about 20%. Coadministration of memantine with the antihyperglycemic drug Glucovance® (glyburide and metformin HCl) did not affect the pharmacokinetics of memantine, metformin and glyburide. Memantine did not modify the serum glucose lowering effects of Glucovance®, indicating the absence of a pharmacodynamic interaction.

Drugs that make the urine alkaline: The clearance of memantine was reduced by about 80% under alkaline urine conditions at pH 8. Therefore, alterations of urine pH towards the alkaline state may lead to an accumulation of the drug with a possible increase in adverse effects. Drugs that alkalinize the urine (e.g. carbonic anhydrase inhibitors, sodium bicarbonate) would be expected to reduce renal elimination of memantine.

Drugs highly bound to plasma proteins: Because the plasma protein binding of memantine is low (45%), an interaction with drugs that are highly bound to plasma proteins, such as warfarin and digoxin, is unlikely.

### CLINICAL TRIALS
The effectiveness of Namenda (memantine hydrochloride) as a treatment for patients with moderate to severe Alzheimer's disease was demonstrated in 2 randomized, double-blind, placebo-controlled clinical studies (Studies 1 and 2) conducted in the United States that assessed both cognitive function and day to day function. The mean age of patients participating in these two trials was 76 with a range of 50-93 years. Approximately 66% of patients were female and 91% of patients were Caucasian.

A third study (Study 3), carried out in Latvia, enrolled patients with severe dementia, but did not assess cognitive function as a planned endpoint.

Study Outcome Measures: In each U.S. study, the effectiveness of Namenda was determined using both an instrument designed to evaluate overall function through caregiver-related assessment, and an instrument that measures cognition. Both studies showed that patients on Namenda experienced significant improvement on both measures compared to placebo.

Day-to-day function was assessed in both studies using the modified Alzheimer's disease Cooperative Study - Activities of Daily Living inventory (ADCS-ADL). The ADCS-ADL consists of a comprehensive battery of ADL questions used to measure the functional capabilities of patients. Each ADL item is rated from the highest level of independent performance to complete loss. The investigator performs the inventory by interviewing a caregiver familiar with the behavior of the patient. A subset of 19 items, including ratings of the patient's ability to eat, dress, bathe, telephone, travel, shop, and perform other household chores has been validated for the assessment of patients with moderate to severe dementia. This is the modified ADCS-ADL, which has a scoring range of 0 to 54, with the lower scores indicating greater functional impairment.

The ability of Namenda to improve cognitive performance was assessed in both studies with the Severe Impairment Battery (SIB), a multi-item instrument that has been validated for the evaluation of cognitive function in patients with moderate to severe dementia. The SIB examines selected aspects of cognitive performance, including elements of attention, orientation, language, memory, visuospatial ability, construction, praxis, and social interaction. The SIB scoring range is from 0 to 100, with lower scores indicating greater cognitive impairment.

#### Study 1 (Twenty-Eight-Week Study)
In a study of 28 weeks duration, 252 patients with moderate to severe probable Alzheimer's disease (diagnosed by DSM-IV and NINCDS-ADRDA criteria, with Mini-Mental State Examination scores ≥3 and ≤14 and Global Deterioration Scale Stages 5-6) were randomized to Namenda or placebo. For patients randomized to Namenda, treatment was initiated at 5 mg once daily and increased weekly by 5 mg/day in divided doses to a dose of 20 mg/day (10 mg twice a day).

Effects on the ADCS-ADL:
Figure 1 shows the time course for the change from baseline in the ADCS-ADL score for patients in the two treatment groups completing the 28 weeks of the study. At 28 weeks of treatment, the mean difference in the ADCS-ADL change scores for the Namenda-treated patients compared to the patients on placebo was 3.4 units. Using an analysis based on

NAMENDA® Tablets/Oral Solution
(memantine hydrochloride)

all patients and carrying their last study observation forward (LOCF analysis), Namenda treatment was statistically significantly superior to placebo.



*Figure 1: Time course of the change from baseline in ADCS-ADL score for patients completing 28 weeks of treatment.*

Figure 2 shows the cumulative percentages of patients from each of the treatment groups who had attained at least the change in the ADCS-ADL shown on the X axis.

The curves show that both patients assigned to Namenda and placebo have a wide range of responses and generally show deterioration (a negative change in ADCS-ADL compared to baseline), but that the Namenda group is more likely to show a smaller decline or an improvement. (In a cumulative distribution display, a curve for an effective treatment would be shifted to the left of the curve for placebo, while an ineffective or deleterious treatment would be superimposed upon or shifted to the right of the curve for placebo.)



*Figure 2: Cumulative percentage of patients completing 28 weeks of double-blind treatment with specified changes from baseline in ADCS-ADL scores.*

Effects on the SIB:
Figure 3 shows the time course for the change from baseline in SIB score for the two treatment groups over the 28 weeks of the study. At 28 weeks of treatment, the mean difference in the SIB change scores for the Namenda-treated patients compared to the patients on placebo was 5.7 units. Using an LOCF analysis, Namenda treatment was statistically significantly superior to placebo.



*Figure 3: Time course of the change from baseline in SIB score for patients completing 28 weeks of treatment.*

Figure 4 shows the cumulative percentages of patients from each treatment group who had attained at least the measure of change in SIB score shown on the X axis.

The curves show that both patients assigned to Namenda and placebo have a wide range of responses and generally show deterioration, but that the Namenda group is more likely to show a smaller decline or an improvement.



*Figure 4: Cumulative percentage of patients completing 28 weeks of double-blind treatment with specified changes from baseline in SIB scores.*

Study 2 (Twenty-Four-Week Study)
In a study of 24 weeks duration, 404 patients with moderate to severe probable Alzheimer's disease (diagnosed by NINCDS-ADRDA criteria, with Mini-Mental State Examination scores ≥5 and ≤14) who had been treated with donepezil for at least 6 months and who had been on a stable dose of donepezil for the last 3 months were randomized to Namenda or placebo while still receiving donepezil. For patients randomized to Namenda, treatment was initiated at 5 mg once daily and increased weekly by 5 mg/day in divided doses to a dose of 20 mg/day (10 mg twice a day).

NAMENDA® Tablets/Oral Solution
(memantine hydrochloride)

Effects on the ADCS-ADL:
Figure 5 shows the time course for the change from baseline in the ADCS-ADL score for the two treatment groups over the 24 weeks of the study. At 24 weeks of treatment, the mean difference in the ADCS-ADL change scores for the Namenda/donepezil treated patients (combination therapy) compared to the patients on placebo/donepezil (monotherapy) was 1.6 units. Using an LOCF analysis, Namenda/donepezil treatment was statistically significantly superior to placebo/donepezil.



*Figure 5: Time course of the change from baseline in ADCS-ADL score for patients completing 24 weeks of treatment.*

Figure 6 shows the cumulative percentages of patients from each of the treatment groups who had attained at least the measure of improvement in the ADCS-ADL shown on the X axis.

The curves show that both patients assigned to Namenda/donepezil and placebo/donepezil have a wide range of responses and generally show deterioration, but that the Namenda/donepezil group is more likely to show a smaller decline or an improvement.



*Figure 6: Cumulative percentage of patients completing 24 weeks of double-blind treatment with specified changes from baseline in ADCS-ADL scores.*

Effects on the SIB:
Figure 7 shows the time course for the change from baseline in SIB score for the two treatment groups over the 24 weeks of the study. At 24 weeks of treatment, the mean difference in the SIB change scores for the Namenda/donepezil-treated patients compared to the patients on placebo/donepezil was 3.3 units. Using an LOCF analysis, Namenda/donepezil treatment was statistically significantly superior to placebo/donepezil.



*Figure 7: Time course of the change from baseline in SIB score for patients completing 24 weeks of treatment.*

Figure 8 shows the cumulative percentages of patients from each treatment group who had attained at least the measure of improvement in SIB score shown on the X axis.

The curves show that both patients assigned to Namenda/donepezil and placebo/donepezil have a wide range of responses, but that the Namenda/donepezil group is more likely to show an improvement or a smaller decline.



*Figure 8: Cumulative percentage of patients completing 24 weeks of double-blind treatment with specified changes from baseline in SIB scores.*

NAMENDA® Tablets/Oral Solution
(memantine hydrochloride)

**Study 3 (Twelve-Week Study)**
In a double-blind study of 12 weeks duration, conducted in nursing homes in Latvia, 166 patients with dementia according to DSM-III-R, a Mini-Mental State Examination score of <10, and Global Deterioration Scale staging of 5 to 7 were randomized to either Namenda or placebo. For patients randomized to Namenda, treatment was initiated at 5 mg once daily and increased to 10 mg once daily after 1 week. The primary efficacy measures were the care dependency subscale of the Behavioral Rating Scale for Geriatric Patients (BGP), a measure of day-to-day function, and a Clinical Global Impression of Change (CGI-C), a measure of overall clinical effect. No valid measure of cognitive function was used in this study. A statistically significant treatment difference at 12 weeks that favored Namenda over placebo was seen on both primary efficacy measures. Because the patients entered were a mixture of Alzheimer's disease and vascular dementia, an attempt was made to distinguish the two groups and all patients were later designated as having either vascular dementia or Alzheimer's disease, based on their scores on the Hachinski Ischemic Scale at study entry. Only about 50% of the patients had computerized tomography of the brain. For the subset designated as having Alzheimer's disease, a statistically significant treatment effect favoring Namenda over placebo at 12 weeks was seen on both the BGP and CGI-C.

**INDICATIONS AND USAGE**
Namenda (memantine hydrochloride) is indicated for the treatment of moderate to severe dementia of the Alzheimer's type.

**CONTRAINDICATIONS**
Namenda (memantine hydrochloride) is contraindicated in patients with known hypersensitivity to memantine hydrochloride or to any excipients used in the formulation.

**PRECAUTIONS**
**Information for Patients and Caregivers:** Caregivers should be instructed in the recommended administration (twice per day for doses above 5 mg) and dose escalation (minimum interval of one week between dose increases).
**Neurological Conditions**
Seizures: Namenda has not been systematically evaluated in patients with a seizure disorder. In clinical trials of Namenda, seizures occurred in 0.2% of patients treated with Namenda and 0.5% of patients treated with placebo.
**Genitourinary Conditions**
Conditions that raise urine pH may decrease the urinary elimination of memantine resulting in increased plasma levels of memantine.
**Special Populations**
**Hepatic Impairment**
Namenda undergoes partial hepatic metabolism, with about 48% of administered dose excreted in urine as unchanged drug or as the sum of parent drug and the N-glucuronide conjugate (74%). No dosage adjustment is needed in patients with mild or moderate hepatic impairment. Namenda should be administered with caution to patients with severe hepatic impairment.
**Renal Impairment**
No dosage adjustment is needed in patients with mild or moderate renal impairment. A dosage reduction is recommended in patients with severe renal impairment (see CLINICAL PHARMACOLOGY and DOSAGE AND ADMINISTRATION).
**Drug-Drug Interactions**
*N-methyl-D-aspartate (NMDA) antagonists:* The combined use of Namenda with other NMDA antagonists (amantadine, ketamine, and dextromethorphan) has not been systematically evaluated and such use should be approached with caution.
*Effects of Namenda on substrates of microsomal enzymes:* In vitro studies conducted with marker substrates of CYP450 enzymes (CYP1A2, -2A6, -2C9, -2D6, -2E1, -3A4) showed minimal inhibition of these enzymes by memantine. In addition, *in vitro* studies indicate that at concentrations exceeding those associated with efficacy, memantine does not induce the cytochrome P450 isozymes CYP1A2, CYP2C9, CYP2E1 and CYP3A4/5. No pharmacokinetic interactions with drugs metabolized by these enzymes are expected.
*Effects of inhibitors and/or substrates of microsomal enzymes on Namenda:* Memantine is predominantly renally eliminated, and drugs that are substrates and/or inhibitors of the CYP450 system are not expected to alter the metabolism of memantine.
*Acetylcholinesterase (AChE) inhibitors:* Coadministration of Namenda with the AChE inhibitor donepezil HCl did not affect the pharmacokinetics of either compound. In a 24-week controlled clinical study in patients with moderate to severe Alzheimer's disease, the adverse event profile observed with a combination of memantine and donepezil was similar to that of donepezil alone.
*Drugs eliminated via renal mechanisms:* Because memantine is eliminated in part by tubular secretion, coadministration of drugs that use the same renal cationic system, including hydrochlorothiazide (HCTZ), triamterene (TA), metformin, cimetidine, ranitidine, quinidine, and nicotine, could potentially result in altered plasma levels of both agents. However, coadministration of Namenda and HCTZ/TA did not affect the bioavailability of either memantine or TA, and the bioavailability of HCTZ decreased by 20%. In addition, coadministration of memantine with the antihyperglycemic drug Glucovance® (glyburide and metformin HCl) did not affect the pharmacokinetics of memantine, metformin and glyburide. Furthermore, memantine did not modify the serum glucose lowering effect of Glucovance®.
*Drugs that make the urine alkaline:* The clearance of memantine was reduced by about 80% under alkaline urine conditions at pH 8. Therefore, alterations of urine pH towards the alkaline condition may lead to an accumulation of the drug with a possible increase in adverse effects. Urine pH is altered by diet, drugs (e.g. carbonic anhydrase inhibitors, sodium bicarbonate) and clinical state of the patient (e.g. renal tubular acidosis or severe infections of the urinary tract). Hence, memantine should be used with caution under these conditions.
**Carcinogenesis, Mutagenesis and Impairment of Fertility**
There was no evidence of carcinogenicity in a 113-week oral study in mice at doses up to 40 mg/kg/day (10 times the maximum recommended human dose [MRHD] on a mg/m²

basis). There was also no evidence of carcinogenicity in rats orally dosed at up to 40 mg/kg/day for 71 weeks followed by 20 mg/kg/day (20 and 10 times the MRHD on a mg/m² basis, respectively) through 128 weeks.
Memantine produced no evidence of genotoxic potential when evaluated in the *in vitro S. typhimurium* or *E. coli* reverse mutation assay, an *in vitro* chromosomal aberration test in human lymphocytes, an *in vivo* cytogenetics assay for chromosome damage in rats, and the *in vivo* mouse micronucleus assay. The results were equivocal in an *in vitro* gene mutation assay using Chinese hamster V79 cells.
No impairment of fertility or reproductive performance was seen in rats administered up to 18 mg/kg/day (9 times the MRHD on a mg/m² basis) orally from 14 days prior to mating through gestation and lactation in females, or for 60 days prior to mating in males.
**Pregnancy**
Pregnancy Category B: Memantine given orally to pregnant rats and pregnant rabbits during the period of organogenesis was not teratogenic up to the highest doses tested (18 mg/kg/day in rats and 30 mg/kg/day in rabbits, which are 9 and 30 times, respectively, the maximum recommended human dose [MRHD] on a mg/m² basis).
Slight maternal toxicity, decreased pup weights and an increased incidence of non-ossified cervical vertebrae were seen at an oral dose of 18 mg/kg/day in a study in which rats were given oral memantine beginning pre-mating and continuing through the postpartum period. Slight maternal toxicity and decreased pup weights were also seen at this dose in a study in which rats were treated from day 15 of gestation through the post-partum period. The no-effect dose for these effects was 6 mg/kg, which is 3 times the MRHD on a mg/m² basis.
There are no adequate and well-controlled studies of memantine in pregnant women. Memantine should be used during pregnancy only if the potential benefit justifies the potential risk to the fetus.
**Nursing Mothers**
It is not known whether memantine is excreted in human breast milk. Because many drugs are excreted in human milk, caution should be exercised when memantine is administered to a nursing mother.
**Pediatric Use**
There are no adequate and well-controlled trials documenting the safety and efficacy of memantine in any illness occurring in children.
**ADVERSE REACTIONS**
The experience described in this section derives from studies in patients with Alzheimer's disease and vascular dementia.
**Adverse Events Leading to Discontinuation:** In placebo-controlled trials in which dementia patients received doses of Namenda up to 20 mg/day, the likelihood of discontinuation because of an adverse event was the same in the Namenda group as in the placebo group. No individual adverse event was associated with the discontinuation of treatment in 1% or more of Namenda-treated patients and at a rate greater than placebo.
**Adverse Events Reported in Controlled Trials:** The reported adverse events in Namenda (memantine hydrochloride) trials reflect experience gained under closely monitored conditions in a highly selected patient population. In actual practice or in other clinical trials, these frequency estimates may not apply, as the conditions of use, reporting behavior and the types of patients treated may differ. Table 1 lists treatment-emergent signs and symptoms that were reported in at least 2% of patients in placebo-controlled dementia trials and for which the rate of occurrence was greater for patients treated with Namenda than for those treated with placebo. No adverse event occurred at a frequency of at least 5% and twice the placebo rate.
Table 1: Adverse Events Reported in Controlled Clinical Trials in at Least 2% of Patients Receiving Namenda and at a Higher Frequency than Placebo-treated Patients.

| Body System<br>Adverse Event | Placebo<br>(N = 922)<br>% | Namenda<br>(N = 940)<br>% |
|---|---|---|
| **Body as a Whole** | | |
| Fatigue | 1 | 2 |
| Pain | 1 | 3 |
| **Cardiovascular System** | | |
| Hypertension | 2 | 4 |
| **Central and Peripheral Nervous System** | | |
| Dizziness | 5 | 7 |
| Headache | 3 | 6 |
| **Gastrointestinal System** | | |
| Constipation | 3 | 5 |
| Vomiting | 2 | 3 |
| **Musculoskeletal System** | | |
| Back pain | 2 | 3 |
| **Psychiatric Disorders** | | |
| Confusion | 5 | 6 |
| Somnolence | 2 | 3 |
| Hallucination | 2 | 3 |
| **Respiratory System** | | |
| Coughing | 3 | 4 |
| Dyspnea | 1 | 2 |

Other adverse events occurring with an incidence of at least 2% in Namenda-treated patients but at a greater or equal rate on placebo were agitation, fall, inflicted injury, urinary incontinence, diarrhea, bronchitis, insomnia, urinary tract infection, influenza-like symptoms, abnormal gait, depression, upper respiratory tract infection, anxiety, peripheral edema, nausea, anorexia, and arthralgia.
The overall profile of adverse events and the incidence rates for individual adverse events in the subpopulation of patients with moderate to severe Alzheimer's disease were not different from the profile and incidence rates described above for the overall dementia population.

**NAMENDA® Tablets/Oral Solution**
(memantine hydrochloride)

**Vital Sign Changes:** Namenda and placebo groups were compared with respect to (1) mean change from baseline in vital signs (pulse, systolic blood pressure, diastolic blood pressure, and weight) and (2) the incidence of patients meeting criteria for potentially clinically significant changes from baseline in these variables. There were no clinically important changes in vital signs in patients treated with Namenda. A comparison of supine and standing vital sign measures for Namenda and placebo in elderly normal subjects indicated that Namenda treatment is not associated with orthostatic changes.

**Laboratory Changes:** Namenda and placebo groups were compared with respect to (1) mean change from baseline in various serum chemistry, hematology, and urinalysis variables and (2) the incidence of patients meeting criteria for potentially clinically significant changes from baseline in these variables. These analyses revealed no clinically important changes in laboratory test parameters associated with Namenda treatment.

**ECG Changes:** Namenda and placebo groups were compared with respect to (1) mean change from baseline in various ECG parameters and (2) the incidence of patients meeting criteria for potentially clinically significant changes from baseline in these variables. These analyses revealed no clinically important changes in ECG parameters associated with Namenda treatment.

**Other Adverse Events Observed During Clinical Trials**
Namenda has been administered to approximately 1350 patients with dementia, of whom more than 1200 received the maximum recommended dose of 20 mg/day. Patients received Namenda treatment for periods of up to 884 days, with 862 patients receiving at least 24 weeks of treatment and 387 patients receiving 48 weeks or more of treatment.

Treatment emergent signs and symptoms that occurred during 8 controlled clinical trials and 4 open-label trials were recorded as adverse events by the clinical investigators using terminology of their own choosing. To provide an overall estimate of the proportion of individuals having similar types of events, the events were grouped into a smaller number of standardized categories using WHO terminology, and event frequencies were calculated across all studies.

All adverse events occurring in at least two patients are included, except for those already listed in Table 1, WHO terms too general to be informative, minor symptoms or events unlikely to be drug-caused, e.g., because they are common in the study population. Events are classified by body system and listed using the following definitions: frequent adverse events - those occurring in at least 1/100 patients; infrequent adverse events - those occurring in 1/100 to 1/1000 patients. These adverse events are not necessarily related to Namenda treatment and in most cases were observed at a similar frequency in placebo-treated patients in the controlled studies.

**Body as a Whole:** *Frequent:* syncope. *Infrequent:* hypothermia, allergic reaction.

**Cardiovascular System:** *Frequent:* cardiac failure. *Infrequent:* angina pectoris, bradycardia, myocardial infarction, thrombophlebitis, atrial fibrillation, hypotension, cardiac arrest, postural hypotension, pulmonary embolism, pulmonary edema.

**Central and Peripheral Nervous System:** *Frequent:* transient ischemic attack, cerebrovascular accident, vertigo, ataxia, hypokinesia. *Infrequent:* paresthesia, convulsions, extrapyramidal disorder, hypertonia, tremor, aphasia, hypoesthesia, abnormal coordination, hemiplegia, hypokinesia, involuntary muscle contractions, stupor, cerebral hemorrhage, neuralgia, ptosis, neuropathy.

**Gastrointestinal System:** *Infrequent:* gastroenteritis, diverticulitis, gastrointestinal hemorrhage, melena, esophageal ulceration.

**Hemic and Lymphatic Disorders:** *Frequent:* anemia. *Infrequent:* leukopenia.

**Metabolic and Nutritional Disorders:** *Frequent:* increased alkaline phosphatase, decreased weight. *Infrequent:* dehydration, hyponatremia, aggravated diabetes mellitus.

**Psychiatric Disorders:** *Frequent:* aggressive reaction. *Infrequent:* delusion, personality disorder, emotional lability, nervousness, sleep disorder, libido increased, psychosis, amnesia, apathy, paranoid reaction, thinking abnormal, crying abnormal, appetite increased, paroniria, delirium, depersonalization, neurosis, suicide attempt.

**Respiratory System:** *Frequent:* pneumonia. *Infrequent:* apnea, asthma, hemoptysis.

**Skin and Appendages:** *Frequent:* rash. *Infrequent:* skin ulceration, pruritus, cellulitis, eczema, dermatitis, erythematous rash, alopecia, urticaria.

**Special Senses:** *Frequent:* cataract, conjunctivitis. *Infrequent:* macula lutea degeneration, decreased visual acuity, decreased hearing, tinnitus, blepharitis, blurred vision, corneal opacity, glaucoma, conjunctival hemorrhage, eye pain, retinal hemorrhage, xerophthalmia, diplopia, abnormal lacrimation, myopia, retinal detachment.

**Urinary System:** *Frequent:* frequent micturition. *Infrequent:* dysuria, hematuria, urinary retention.

**Events Reported Subsequent to the Marketing of Namenda, both US and Ex-US**
Although no causal relationship to memantine treatment has been found, the following adverse events have been reported to be temporally associated with memantine treatment and are not described elsewhere in labeling: aspiration pneumonia, asthenia, atrioventricular block, bone fracture, carpal tunnel syndrome, cerebral infarction, chest pain, cholelithiasis, claudication, colitis, deep venous thrombosis, depressed level of consciousness (including loss of consciousness and rare reports of coma), dyskinesia, dysphagia, encephalopathy, gastritis, gastroesophageal reflux, grand mal convulsions, intracranial hemorrhage, hepatitis (including increased ALT and AST and hepatic failure), hyperglycemia, hyperlipidemia, hypoglycemia, ileus, increased INR, impotence, lethargy, malaise, myoclonus, neuroleptic malignant syndrome, acute pancreatitis, Parkinsonism, acute renal failure (including increased creatinine and renal insufficiency), prolonged QT interval, restlessness, sepsis, Stevens-Johnson syndrome, suicidal ideation, sudden death, supraventricular tachycardia, tachycardia, tardive dyskinesia, thrombocytopenia, and hallucinations (both visual and auditory).

**ANIMAL TOXICOLOGY**
Memantine induced neuronal lesions (vacuolation and necrosis) in the multipolar and pyramidal cells in cortical layers III and IV of the posterior cingulate and retrosplenial neocortices in rats, similar to those which are known to occur in rodents administered other NMDA receptor antagonists. Lesions were seen after a single dose of memantine. In a study in which rats were given daily oral doses of memantine for 14 days, the no-effect dose for neuronal necrosis was 6 times the maximum recommended human dose on a mg/m² basis. The potential for induction of central neuronal vacuolation and necrosis by NMDA receptor antagonists in humans is unknown.

**DRUG ABUSE AND DEPENDENCE**
**Controlled Substance Class:** Memantine HCl is not a controlled substance.
**Physical and Psychological Dependence:** Memantine HCl is a low to moderate affinity uncompetitive NMDA antagonist that did not produce any evidence of drug-seeking behavior or withdrawal symptoms upon discontinuation in 2,504 patients who participated in clinical trials at therapeutic doses. Post marketing data, outside the U.S., retrospectively collected, has provided no evidence of drug abuse or dependence.

**OVERDOSAGE**
Signs and symptoms associated with memantine overdosage in clinical trials and from worldwide marketing experience include agitation, confusion, ECG changes, loss of consciousness, psychosis, restlessness, slowed movement, somnolence, stupor, unsteady gait, visual hallucinations, vertigo, vomiting, and weakness. The largest known ingestion of memantine worldwide was 2.0 grams in a patient who took memantine in conjunction with unspecified antidiabetic medications. The patient experienced coma, diplopia, and agitation, but subsequently recovered.

Because strategies for the management of overdose are continually evolving, it is advisable to contact a poison control center to determine the latest recommendations for the management of an overdose of any drug.

As in any cases of overdose, general supportive measures should be utilized, and treatment should be symptomatic. Elimination of memantine can be enhanced by acidification of urine.

**DOSAGE AND ADMINISTRATION**
The dosage of Namenda (memantine hydrochloride) shown to be effective in controlled clinical trials is 20 mg/day.

The recommended starting dose of Namenda is 5 mg once daily. The recommended target dose is 20 mg/day. The dose should be increased in 5 mg increments to 10 mg/day (5 mg twice a day), 15 mg/day (5 mg and 10 mg as separate doses), and 20 mg/day (10 mg twice a day). The minimum recommended interval between dose increases is one week.

Namenda can be taken with or without food.

Patients/caregivers should be instructed on how to use the Namenda Oral Solution dosing device. They should be made aware of the patient instruction sheet that is enclosed with the product. Patients/caregivers should be instructed to address any questions on the usage of the solution to their physician or pharmacist.

**Doses in Special Populations**
A target dose of 5 mg BID is recommended in patients with severe renal impairment (creatinine clearance of 5 – 29 mL/min based on the Cockroft-Gault equation):
*For males:* CLcr = [140-age (years)] · Weight (kg)/[72 · serum creatinine (mg/dL)]
*For females:* CLcr = 0.85 · [140-age (years)] · Weight (kg)/[72 · serum creatinine (mg/dL)]

**HOW SUPPLIED**
**5 mg Tablet:**
Bottle of 60                        NDC #0456-3205-60
10 x 10 Unit Dose              NDC #0456-3205-63
The capsule-shaped, film-coated tablets are tan, with the strength (5) debossed on one side and FL on the other.

**10 mg Tablet:**
Bottle of 60                        NDC #0456-3210-60
10 x 10 Unit Dose              NDC #0456-3210-63
The capsule-shaped, film-coated tablets are gray, with the strength (10) debossed on one side and FL on the other.

**Titration Pak:**
PVC/Aluminum Blister package containing 49 tablets. 28 x 5 mg and 21 x 10 mg tablets.
NDC #0456-3200-14

The 5 mg capsule-shaped, film-coated tablets are tan, with the strength (5) debossed on one side and FL on the other. The 10 mg capsule-shaped, film-coated tablets are gray, with the strength (10) debossed on one side and FL on the other.

**Oral Solution**
The dosage recommendations for oral solution are the same as those for tablets. The oral solution is clear, alcohol-free, sugar-free, and peppermint flavored.

**2 mg/mL Oral Solution** (10 mg = 5 mL)
12 fl. oz. (360 mL) bottle      NDC #0456-3202-12
Store at 25°C (77°F); excursions permitted to 15-30°C (59-86°F) [see USP Controlled Room Temperature].

Forest Pharmaceuticals, Inc.
Subsidiary of Forest Laboratories, Inc.
St. Louis, MO 63045
Licensed from Merz Pharmaceuticals GmbH
Rev. 04/07

 **FOREST PHARMACEUTICALS, INC.**
Subsidiary of Forest Laboratories, Inc.
St. Louis, Missouri 63045

© 2007 Forest Laboratories, Inc.